GRAYBAR ELECTRIC COMPANY, INC., Appellant, v. AUTOMOTIVE, PETROLEUM & ALLIED INDUSTRIES EMPLOYEES UNION, LOCAL 618, et al., Respondents, No. 44192—287 S. W. (2d) 794.

Court en Banc, February 13, 1956.

Rehearing Denied, March 12, 1956.

754

*David F. Crossen, Charles H. Spoehrer* and *Victor B. Harris* for appellant.

*Harry H. Craig* and *Norman W. Armbruster* for respondents; *Wiley, Craig, Armbruster, Schmidt & Wilburn* of counsel.

758

[795]. HOLLINGSWORTH, J.—Plaintiff has appealed from a judgment of the Circuit Court of the City of St. Louis dismissing its

action against Automotive, Petroleum & Allied Industries Employees' Union, Local 618, and its officials to enjoin alleged unlawful picketing of plaintiff's business premises and for compensatory and exemplary damages in the aggregate sum of $550,000.

Plaintiff is a wholesale distributor of electrical products. It is engaged in interstate commerce and is subject to the provisions of the Labor Management Relations Act, 1947, 29 U.S.C.A. § 141 et seq. Its plant is located at 2642 Washington Avenue, St. Louis, where an office force of 120 persons and a warehouse force of 15 persons are regularly employed. Defendant union, Local 618, is an unincorporated affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, A. F. of L. The individual defendants are its principal officers and are made parties both in their official capacities and as individuals being sufficiently representative of the class of which they are members. No employee of plaintiff is a member of Local 618 and no claim is made that any of them ever has been or has expressed any desire to be a member thereof.

After unsuccessful attempts to organize plaintiff's warehousemen, defendants began picketing plaintiff's premises on May 14, 1952. Plaintiff thereupon petitioned the National Labor Relations Board for investigation and certification of representatives and was advised that no claim of representation was made by the union and that the Board had no jurisdiction to determine any question of representation.

Prior to June 12, 1952, plaintiff had received no communication whatever from defendants. On that date, in response to [796] written inquiry from plaintiff, defendant union, by letter advised plaintiff as follows:

"This labor organization has established a picket line at the premises of your company and we desire to advise you of the objects and purposes for which such picketing is being conducted and of our attitude and policy with respect to various corollary matters that may arise in the course thereof.

"According to information available to us, a majority of the employees of your concern are not members of this labor organization. We are interested in persuading those employees, if possible, and by the use of lawful means only, to apply for membership in our Local Union.

"In connection with the efforts of our Union to persuade such employees to make application for membership, we have found that public opinion plays a very important role. That is to say, if the employees of an employer come to the conclusion that the public (constituting their customers) prefers to patronize them as union mem-

bers, such employees more readily respond to the request of a Union to become members. * * * *

* * * * *

"* * * * This Union is not making any demand at this time upon your Company or its management to execute or agree to any contract with our Union covering any of your said employees. * * * *"

This suit was brought on June 18, 1952, on which date the trial court issued a restraining order against further picketing of plaintiff's premises and an order on defendants to show cause why a temporary injunction should not be issued. Plaintiff's amended petition alleged, as grounds for temporary and, upon final hearing, permanent injunction: that no labor dispute existed between plaintiff and the union or any of plaintiff's employees; that defendants "are maintaining continuous picketing of plaintiff's premises for the purpose of preventing deliveries to and from said premises so that plaintiff will be coerced into recognizing said Local 618 as a representative of its employees, in violation of said Labor Management Relations Act and of Section 29, Article 1, of the Constitution of the State of Missouri"; that the pickets "are stopping all persons who approach plaintiff's premises and requesting them not to deal with plaintiff; are seeking to and in fact succeeding in stopping deliveries to plaintiff; are advising plaintiff's customers * * * and trucking companies * * * that no deliveries should be made because of the aforesaid picketing"; and that unless restrained said picketing will cause plaintiff irreparable loss and now has reduced plaintiff's business to the extent of $116,000.

The joint answer of defendants denied the aforesaid allegations and affirmatively alleged, among other things: that the picketing was for the lawful purpose of informing the public that plaintiff's employees were non-union, thereby to persuade the general public to patronize similar business enterprises that were union, and thereby to persuade plaintiff's employees of the desirability of unionism; that to deny defendants the right to picket plaintiff's premises would deny them the right of free speech in violation of the First and Fourteenth Amendments to the Constitution of the United States and Section 8 of Article I of the Constitution of Missouri and the right to engage in organizational activities in violation of Article I, Section 29, of said Constitution of Missouri.

Defendants' joint answer further affirmatively alleged that the facts pleaded by plaintiff, if true, constitute a violation of Sections 157 and 158 (a) (1) and (3) of the Labor Management Relations Act of 1947; that Section 160 of said Act provides the means whereby the acts alleged may be restrained in the Federal Courts and that the means so provided in the Act are exclusive; that Congress, by said

Act, pre-empted the field of such disputes and that the courts of Missouri are without jurisdiction in the premises.

[797] Upon trial of the case, it was agreed that damage counts pleaded in both the petition and answer would be deferred until final disposition of the issue of plaintiff's right to injunctive relief.

Plaintiff's evidence will be briefly stated. (Italicised language appearing throughout this opinion indicates our emphasis unless otherwise specified.)

The picketing consisted of a single picket walking along the sidewalk in front of the motor vehicle entrance to plaintiff's warehouse and carrying an umbrella with the word "TEAMSTERS" in capital letters and the word "NON-UNION" in larger letters; one umbrella also had thereon the additional words, "This company does not employ members of Teamsters Local 618"; another the additional words, "Not under contract with Teamsters Local 618". The picketing was at all times entirely peaceful.

Plaintiff leases three trucks from Lueking Transfer Company which bear plaintiff's name but are operated by Lueking employees who work for plaintiff on a permanent basis. Said employees are members of Local 600, another affiliate of Teamsters Union. These trucks are used by plaintiff exclusively for city deliveries. After the picketing started, the Lueking drivers refused to cross the picket line. This was likewise true as to other truck drivers with incoming and outgoing freight. At first, the picketing began about 7:30 a.m. and continued to about 5:30 p.m. In order to avoid the picket line, the Lueking drivers, at the direction of plaintiff, would arrive at 6:00 a.m., load their trucks and return after the picket went off duty. Later the picketing hours were lengthened and arrivals and departures of trucks were changed accordingly. This resulted in the picketing going on an around-the-clock basis. Thereafter no deliveries were made to or from plaintiff's premises by the regular truckers or Lueking drivers. The employees of some fifty of the trucking companies that customarily made deliveries to and for plaintiff, although advised that there was no strike at plaintiff's premises and no labor dispute of any kind with its employees, refused to make deliveries because of the picketing. Numerous notices given to plaintiff by such trucking companies as to failure to make deliveries to plaintiff of merchandise in their possession and consigned to plaintiff were received in evidence. These notices recited, in substance, that the refusals to deliver were due to a "strike" at plaintiff's place of business. One of the pickets at plaintiff's premises stated: "I turned back twelve trucks this morning." On another occasion one of the pickets was heard to say to a driver: "Can't you see we are picketing this place? You are not supposed to go in there."

By using a warehouse operated by Lueking and some of plaintiff's own warehouse employees, plaintiff was enabled to maintain its

city deliveries to a limited extent. But such deliveries were always late, which resulted in extensive cancellations of orders, amounting to a reduction in plaintiff's business during the first fifteen days of picketing in the sum of $58,000. Defendants agreed that plaintiff's losses were sufficient to justify injunctive relief if it was otherwise entitled to it.

At the close of plaintiff's evidence in chief, defendants orally moved for a dismissal of the petition, "in the nature of an oral motion for a directed verdict", which motion the court took under advisement, it being understood that if the court denied the motion defendants thereafter would present their evidence.

On June 23, 1953, the parties, in open court, stipulated:

"1. That subsequent to the close of plaintiff's case, and on December 9, 1952, plaintiff filed unfair labor practice charges against defendants with the Fourteenth Region of the National Labor Relations Board in Case No. 14-CB-180, said charges alleging that defendants have been and are engaging in unfair labor practices within the meaning of Section (8b) subsections (1) (A) and (2) of the National Labor Relations Act, as amended, based upon the following alleged acts and conduct:

[798] "'On or about May 14, 1952 and at all times since that date in violation of Section 8(b)(2) of the Act said organization by its agents, officers and representatives has attempted to cause the Graybar Electric Company, Inc. to discriminate against its employees in violation of Section 8(a)(3) of the Act by picketing for the purpose of forcing said employer to coerce and restrain its employees in the exercise of their rights as guaranteed by Section 7 of the Act.

"'Further, in violation of Section 8(b) (1) (A) of the Act, continuously from May 14, 1952 said labor organization has by its officers, agents and representatives unlawfully coerced and restrained the employees of Graybar Electric Company, Inc. in the exercise of their rights as guaranteed by Section 7 of the Act in that said labor organization has picketed for the purpose of coercing said employees in their right to join or not join a labor organization and has restrained said employees by that picketing in the exercise of the rights guaranteed to them by Section 7 of the Act.'

"2. That subsequent to the filing of the unfair labor practice charges as aforesaid, the Regional Director for the Fourteenth Region of the National Labor Relations Board made an investigation of said charges and refused to issue a complaint in connection therewith.

"3. That plaintiff duly appealed from the ruling of said Regional Director [refusing?] to issue said complaint to the General Counsel of the National Labor Relations Board in Washington, D.C.

"4. That on the 21st day of April, 1953, the General Counsel for the National Labor Relations Board issued his ruling and de-

cision in connection with said appeal in words and figures as follows, to-wit:

" 'Your appeal from the Regional Director's refusal to issue a complaint in the above captioned case, charging a violation of Section 8(b)(1)(A) and (2) of the National Labor Relations Act, has been duly considered by the General Counsel.

" 'The General Counsel sustains the ruling of the Regional Director. Like the Regional Director, the General Counsel concludes that there is insufficient evidence to warrant further proceedings.' "

Defendants' motion to dismiss thereafter was sustained by the trial court and judgment was entered for defendants, from which, as stated, plaintiff appealed. The cause thereafter was argued in Division One of this Court, but disposition was withheld pending decision of the case of Weber v. Anheuser-Busch, Inc., in the Supreme Court of the United States. In the meantime, the case of Garner v. Teamsters, Chauffeurs & Helpers Local Union 776, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228, was decided by the Supreme Court of the United States. Following the decision of the Weber case in said Court in March, 1955, 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 386, this case, of our own motion, was transferred to Banc, where it was again briefed and on September 27, 1955, orally argued and submitted.

▉ Both parties say the Garner and Weber cases are decisive of the question of whether the State Court in which instant case was tried or the National Labor Relations Board (NLRB) has jurisdiction of the controversy here involved. The difficulty is, however, that the parties are diametrically opposed as to which of the aforesaid tribunals the Garner and Weber cases declare to be vested with jurisdiction; plaintiff asserting that an analysis of the decisions shows it would be error to deny state jurisdiction; defendants asserting the decisions determine that the NLRB is vested with exclusive primary jurisdiction to hear the controversy and that it has investigated the charges and found them without merit, thereby sanctioning the picketing as lawful (protected) picketing under the federal Act.

In the Garner case, certain trucking business operators sought to enjoin the union from picketing on the ground that the purpose thereof was to coerce operators into violating a Pennsylvania statute (quite similar in substance to pertinent provisions [799] of the Labor Management Relations Act of 1947) forbidding employers to encourage or discourage membership in a labor organization by discrimination in hiring, tenure of employment, or any condition of employment. The trial court entered a decree restraining the picketing. The Supreme Court of Pennsylvania reversed on the ground the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq., "precluded any State action by way of a different or additional remedy for the correction of the identical grievance." 373 Pa. 19, 94 A. 2d

893. The Supreme Court of the United States, speaking through Mr. Justice Jackson, affirmed the judgment of the Supreme Court of Pennsylvania, and in doing so made, among others, the following observations:

"The Supreme Court of the Commonwealth held, quite correctly, we think, that petitioners' grievance fell within the jurisdiction of the Nation Labor Relations Board to prevent unfair labor practices. It therefore inferred that state remedies were precluded. * * * *

\* \* \* \* \*

"Congress has taken in hand this particular type of controversy where it affects interstate commerce. In language almost identical to parts of the Pennsylvania statute, it has forbidden labor unions to exert certain types of coercion on employees through the medium of the employer. It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. *The power and duty of primary decision lies with the Board, not with us. But it is clear that the Board was vested with power to entertain petitioners' grievance, to issue its own complaint against respondents and, pending final hearing, to seek from the United States District Court an injunction to prevent irreparable injury to petitioners while their case was being considered. The question then is whether the State, through its courts, may adjudge the same controversy and extend its own form of relief.*

"*Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order.* Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. * * * *

\* \* \* \* \*

"* * * * But when two separate remedies are brought to bear on the same activity, a conflict is imminent. It must be remembered that petitioners' state remedy was a suit for an injunction prohibiting the picketing. The federal Board, if it should find a violation of the national Labor Management Relations Act, would issue a cease and desist order and perhaps obtain a temporary injunction to preserve

the *status quo.* Or if it found no violation, it would dismiss the complaint, thereby sanctioning the picketing. * * * *

"The detailed prescription of a procedure for restraint of specified types of picketing would seem to imply that other picketing is to be free of other methods and sources of restraint. For the policy of the national Labor Management Relations Act is not to condemn all picketing but only that ascertained by its prescribed processes to [800] fall within its prohibitions. Otherwise, it is implicit in the Act that the public interest is served by freedom of labor to use the weapon of picketing. *For a state to impinge on the area of labor combat designed to be free is quite as much an obstruction of federal policy as if the state were to declare picketing free for purposes or by methods which the federal Act prohibits.*"

The Weber case came down after the Garner case. It grew out of a dispute between labor unions over millwright work being performed for Anheuser-Busch, Inc., each union claiming the work for its own members, resulting in one of the unions going on strike. On the day after the strike was called, Anheuser-Busch filed with NLRB a charge of unfair labor practice under *one* (only) section of the Labor Management Relations Act of 1947. Before the Board acted upon the charge, Anheuser-Busch sought an injunction in the Circuit Court of the City of St. Louis on the ground the strike constituted a violation of Missouri's statutes defining unlawful restraint of trade and a secondary boycott under the common law of Missouri and was in violation of several subsections of the National Labor Management Relations Act *other than those of which it had complained to the Board.* The NLRB held that no dispute existed within the meaning of the invoked section. Thereafter the St. Louis Circuit Court granted an injunction, holding that the striking union's conduct constituted an illegal conspiracy in restraint of trade under Missouri law. On appeal, this Court (Anheuser-Busch, Inc. v. Weber, 364 Mo. 573, 265 S.W. 2d 325) affirmed the judgment. The Supreme Court of the United States held we erred in so doing. In the course of its opinion, delivered by Mr. Justice Frankfurter, it quoted with approval from the Garner case, and further said:

"A State may not enjoin under its own labor statute conduct which has been made an 'unfair labor practice' under the federal statutes. Such was the holding in the Garner case, supra. The Court pointed out that exclusive primary jurisdiction to pass on the union's picketing is delegated by the Taft-Hartley Act to the National Labor Relations Board. * * * *

* * * * *

"We do not mean to pass on the question whether the Board, by finding that no violation of (D) was involved, inferentially ruled that other subsections were or were not violated. The point is rather that the Board, and not the state court, is empowered to pass

upon such issues in the first instance. If a ruling on (D) necessarily encompassed a ruling on the other subsections, we would have a different case. * * * *

. ' . * . * . * * *. * . ,

"* * * * [E]ven if it were clear that no unfair labor practices were involved, it would not necessarily follow that the State was free to issue its injunction. If this conduct does not fall within the prohibitions of § 8 of the Taft-Hartley Act, it may fall within the protection of § 7, as concerted activity for the purpose of mutual aid or protection.

* * * * * *

"* * * But where the moving party itself alleges unfair labor practices, where the facts reasonably bring the controversy within the sections prohibiting these practices, and where the conduct, if not prohibited by the federal Act, may be reasonably deemed to come within the protection afforded by that Act, the state court must decline jurisdiction in deference to the tribunal which Congress has selected for determining such issues in the first instance."

Plaintiff seizes upon the statements made in the Garner and Weber cases to the effect that exclusive *primary jurisdiction* to pass on the legality of union picketing was vested by the Labor Management Relations Act in the National Labor Relations Board, and the further statement in the Weber case to the effect that had the NLRB found the union not guilty of any violation of any of [801] the unfair labor practices defined in subsections 158 (b) (4) of the Labor Management Relations Act instead of limiting its finding to subsection (D) thereof, "we would have a different case".

In its brief filed to the Court en Banc, plaintiff said these cases amount to a holding that federal jurisdiction is primary only and not exclusive and that when the NLRB, acting through its General Counsel, determined that the conduct involved was not an unfair labor practice, the state court was free to apply its own laws, to wit: the provisions of Article I, § 29, of the Constitution of Missouri, which guarantees to employees the right to organize and to bargain collectively through representatives of their own choosing.

As we read the Garner and Weber cases, they hold to the contrary. By the use of the phrase "primary jurisdiction", these cases mean that not even the federal courts can determine whether certain acts constitute an unfair labor practice until the NLRB has first considered them; and that when the NLRB has exercised its jurisdiction, such action is final, except by way of review to the extent provided in § 160 (f), to wit: "Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person

resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside. * * * *'' So, in effect, say the hereinabove emphasized extracts from the Garner case and, more specifically, says the Weber case in these words, loc.cit. 487: ''Controlling and therefore superseding federal power cannot be curtailed by the State even though the ground of intervention be different than that on which federal supremacy has been exercised.'' A fortiori, jurisdiction cannot be exercised by the State courts where the acts alleged to constitute the unfair labor practices complained of by plaintiff and denied by defendants present an issue within the legislative scope of the Act. Such an exercise of State powers would come into conflict with the power given to the Congress to regulate matters affecting interstate commerce.

The statement made in the Weber opinion to the effect that if the ruling on subsection (D) of 8(b) (4) encompassed a ruling of the other subsections, ''we would have a different case'', seems to mean that had NLRB decided that the picketing there involved did not constitute a charge of any unfair labor practice, as defined in the Act, *and neither did it constitute picketing protected* (''sanctioned'' is the word used in the Garner case) *by the federal Act*, then the State Court would have jurisdiction to consider its legality *under State laws not involving allegedly unlawful labor practices over which NLRB had been given exclusive primary jurisdiction by the federal Act*, such as, for example, picketing violative of the police power of the State, anti-conspiracy statutes, or tortious acts resulting in damage to the employer or employees. Note the further statement in the Weber case, loc.cit. 487: ''Moreover, we must not forget that this case is not clearly one of 'unfair labor practices'. Certainly if the conduct is eventually found by the National Labor Relations Board to be *protected* by the Taft-Hartley Act, the State cannot be heard to say that it is enjoining that conduct for reasons other than those having to do with labor relations.''

But, even if we err in our interpretation of the meaning of the aforesaid phrase, it simply cannot have the meaning attributed to it by plaintiffs, for the reason it would be destructive of the definitely clear holding of both the Garner and Weber cases that the Labor Management Relations Act has vested exclusive primary jurisdiction of labor disputes such as is here involved in the National Labor Relations Board and that its action, subject to federal court review, is binding upon the states.

In its reply brief, plaintiff seeks to avoid the effect of the Garner and Weber cases [802] by asserting for the first time that the dismissal of its charges by the General Counsel amounted to a refusal to accept jurisdiction rather than a decision on the merits and that

jurisdiction to determine the dispute was thereby invested in the state courts, citing: Lincourt v. N.L.R.B., 170 F. 2d 306, 307 (1st, 1948) Jacobsen v. N.L.R.B., 120 F. 2d 96 (C.C.A. 3, 1941) ; Building Trades Council v. Kinard, 346 U.S. 933, 74 S.Ct. 373 (1954) ; Cooper-Utter Lumber Co., 34 L.R.R.M. 1287 (Wisconsin Labor Board, 1954) ; Raisch Motors, 35 L.R.R.M. 1631, 1632 (New York Labor Board, 1955) ; Walker Motors, 36 L.R.R.M. 1290 (Michigan Labor Board, 1955) ; Your Food Stores v. Retail Clerks, 124 F. Supp. 697, 35 L.R.R.M. 2361, 2366 (D.C., N.M., 1954). These cases involved a situation not shown to be present in the instant case.

In 1954, NLRB announced it would decline jurisdiction in a certain class of cases wherein the dollar volume of the employer's business, as it affected interstate commerce, was below certain specified amounts. See Raisch Motors, 35 L.R.R.M. 1631, 1632; National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284. This is also the background of the Kinard case (Building Trades Council v. Kinard Construction Co., 346 U.S. 933, 74 S.Ct. 373, 98 L.Ed. 423) wherein the United States Supreme Court refused to pass upon the right of the State court to grant its own relief in the absence of a showing that the employer had applied to the NLRB or that it would be futile to do so. See decision of the Supreme Court of Alabama, Kinard Construction Co. v. Building Trades Council, 258 Ala. 500, 64 So. 2d 400.

We think the above listed cases cited by plaintiff are readily distinguishable from the instant case. They deal with disputes which the Board, without regard to the merits, had arbitrarily refused to hear. In other words, in the aforesaid cases, the Board had refused to consider the merits or to exercise its jurisdiction to award or refuse relief in any event, apparently on some theory akin to de minimis non curat lex. No suggestion is made that the refusal to issue a complaint in this case is based upon any such theory.

Upon what basis did the Board, acting through its General Counsel, refuse to issue a complaint? And what effect, if any, did the charges made by plaintiff to NLRB and the Board's action thereon have on the question of jurisdiction of this controversy?

The charges made by plaintiff to the Board, as well as the allegations of plaintiff's petition, were that defendants' picket line was maintained for the purpose of preventing deliveries to and from its premises so that plaintiff would be coerced into recognizing Local 618 as a representative of its employees, in violation of the Labor Management Relations Act. Such an allegation comes squarely within §§ 157 and 158 (a) (1) and, possibly, 158 (a) (3) of the Act; 29 U.S.C.A., which provide:

§ 157 "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other

concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities * * *"

(The term "employee" includes any employee, and is not limited to the employees of a particular employer, unless explicitly otherwise specified. See § 152 (3), 29 U.S.C.A.)

§ 158. "(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

* * * * *

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: * * * *"

Defendants' answer presented a clear-cut issue as to whether the conduct with which [803] they were charged was true and, if so, whether it was prohibited by the Act or, if not so prohibited, could be found to come within the protection afforded by the Act. Garner case, supra. Consequently, when the Circuit Court of the City of St. Louis assumed jurisdiction and heard the evidence, it was without jurisdiction so to do. Garner and Weber cases, supra; Jack Cooper Transport Co. v. Stufflebeam, 365 Mo. 250, 280 S.W. 2d 832. We do not understand that plaintiff otherwise contends. Plaintiff's contention seems to be that jurisdiction vested in the State court when the NLRB refused to prosecute the charges filed with it by plaintiff long after submission of the case in the State court. We cannot agree.

Section 160 of the Act prescribes in detail the procedure to be followed by the Board if, after investigation of a charge such as was made by plaintiff, it decides to proceed further with it by the filing of a complaint and, after notice to the party complained of, to hear and determine the merits; and, finally, review of such proceeding as hereinbefore stated.

Sections 102.9 to 102.19 of the Rules of the Board are set forth in an appendix to Title 29 U.S.C.A., following § 262. Rule 102.10 provides for the filing of such charges before the Regional Director of the NLRB in the first instance. Rule 102.19 provides that if the Regional Director declines to issue a complaint, his action may be reviewed by the General Counsel.

Section 153 (d) of the Act provides: "* * * * The General Counsel of the Board shall exercise general supervision over all attorneys employed by the Board (other than trial examiners and legal assistants to Board members) and over the officers and employees in the regional offices. He shall have final authority, on behalf of the Board, in respect of the investigation of charges and issuance of complaints under section 160 of this title, and in respect of the prosecution of such complaints before the Board, * * *"

"As above stated, it was stipulated that the Regional Director "made an investigation" of the charges filed by plaintiff and refused to issue a complaint. Thereafter, on appeal to the General Counsel, he found that "there is insufficient evidence to warrant further proceedings". By express provision of the Act (§ 153 (d) above quoted), *he had final authority on behalf of the Board to determine that very issue.* Such a finding in and of itself precludes any legitimate contention that the Board declined to accept jurisdiction of the controversy. Rather does it definitely reflect that the Board did exercise its jurisdiction, did consider the evidence, and did decide that the evidence did not warrant further action.

It is true, as plaintiff contends, that § 160 (f) of the Act provides only for an appeal from "a final order of the Board granting or denying in whole or in part the relief sought", and that it has been held in Lincourt v. National Labor Relations Board, 1st U.S.C.C.A., 170 F.2d 306, that the refusal of the General Counsel to issue a complaint under § 153 (d) is not an appealable final order of the Board within the meaning of § 160 (f). Assuming, however, that the conclusion reached in the Lincourt case is sound, it does not follow, as we understand the provisions of § 153 (d), that a finding by the General Counsel that there is insufficient evidence to warrant further proceedings does not constitute a final disposition of the case on the merits, at least until further charges are filed and a new investigation is made under the provisions of the Act. It would seem that for some reason known to the Congress it saw fit not to provide for appeals from a decision of the General Counsel not to issue a complaint. However much the failure of the Act to provide for an appeal from such a disposition of the case may be deplored in that it seems to leave the complaining party without further remedy, any rectification thereof is necessarily a matter for the Congress.

But, again, if we err in holding that the action of the Board was a disposition of the case on the merits, it does not follow that jurisdiction, which had theretofore been in the NLRB, reverted to the State court. The case of Your Food Stores v. Retail Clerks, 124 F.Supp. 697, [804] cited by plaintiff in its reply brief as authority for its contention, was subsequently reversed with directions, Retail Clerks Local No. 1564 v. Your Food Stores of Santa Fe, by the 10th U.S.C.C.A., 225 F. 2d 659, the court saying: "Moreover, the refusal by the NLRB to entertain the instant grievance on its merits did not of itself alter the pertinent law thereby revesting the state court with authority to proceed. Amended section 10(a) of the Act specifically provides what this Court deems to be the only way state authorities can be vested with authority now within the exclusive purview of the Act. Unless and until there is an express ceding of jurisdiction to a proper state agency exclusive jurisdiction remains in the federal agency. For sake of order such must be true. Otherwise, an intermi-

nable problem of determining jurisdiction would exist, throwing needless confusion into an area clearly pre-empted by Congress.'' (Section 10(a) of the Act, as referred to in the above quotation, is Section 160 (a), Title 29 U.S.C.A. It empowers the NLRB by agreement with any state agency to cede to such agency jurisdiction over labor disputes affecting interstate commerce if the regulating labor laws of such state are not inconsistent with the Labor Management Relations Act. Missouri has no such agency and no contention is made that NLRB has ceded or could cede any of its jurisdiction to our Missouri courts under this provision.)

We hold that the Circuit Court of the City of St. Louis was without jurisdiction of the merits and its judgment of dismissal must be sustained on that ground.

The majority of the members of the court adhering to the views expressed in the principal opinion herein, and upon the further authority of The Aetna Freight Lines, Inc. v. Stanley Clayton, etc., 228 F. 2d 384, the motion for rehearing is overruled.

*Leedy, C.J.; Dalton, Westhues* and *Storckman, JJ.;* concur; *Eager, J.,* dissents in dissenting opinion; and *Hyde, J.,* dissents and concurs in dissenting opinion of *Eager, J.,*

■ EAGER, J. (dissenting).—The majority opinion holds, as is urged by defendants' counsel, that the *Labor Board* accepted jurisdiction and adjudicated the charges of unfair labor practices on the merits, thus foreclosing all other proceedings. I cannot agree. The matter never reached the Labor Board, as I understand the applicable law. Prior to the amendment of the N.L.R.A. in 1947, the Labor Board was both prosecutor and judge. Because of many objections to that somewhat inconsistent combination of functions, the two were separated in the Act as amended (Title 29, § 153, U.S.C.A.); the Board retained all judicial (or quasi-judicial) functions while the full and sole power of prosecution was given to the General Counsel. The latter is appointed by the President, with the consent of the Senate, and his primary function is to investigate charges, and issue and prosecute complaints ''before the Board''; he also has incidental supervisory powers over certain other attorneys, not including legal assistants to board members or trial examiners. The Board has no *jurisdiction* to proceed in an unfair labor practice matter until the General Counsel issues a complaint. In issuing or refusing to issue complaints, the action of the General Counsel is final, as is conceded in the majority opinion. As the prosecutor under the act (or ''of the Board,'' if that term is preferred) he is an *administrative* officer. In Lincourt v. N.L.R.B. (C.A. 1), 170 F. 2d 306, the court said: ''The issuance of a complaint under § 10 of the Act is a matter of administrative discretion. * * *'' See also: General Drivers Local 886, AFL, v. N.L.R.B. (C.A. 10), 179 F. 2d 492. Certainly he has been

so regarded; and his decisions are in no wise judicial determinations. It is also pertinent to note that in issuing or refusing to issue complaints, he acts wholly independently of the Board, and that neither the Board nor the courts can control, direct, or restrain his actions, by mandamus or otherwise. Hourihan v. N.L.R.B. (C.A.D.C.), 201 F. 2d 187, certiorari denied, 345 U.S. 930; rehearing denied, 345 U.S. 961, 346 U.S. 843, 880, 917; there the court said, l.c. 188; "* * * The Board cannot issue an order [805] until the General Counsel issues a complaint. A court has no power to order the General Counsel to issue a complaint and no power to require the Board to issue an order *in a matter which is not before the Board."*. (Italics inserted.)

The relationship between the General Counsel and the Board becomes more readily understandable when we compare it to that existing between a prosecuting attorney and the court of general jurisdiction in which he serves. When a set of facts is submitted to the prosecutor for possible prosecution and he talks to the witnesses, he may well decide that the evidence is, *in his opinion,* insufficient for prosecution or conviction. In such case, he merely declines to file an information or charge. However, a grand jury may still indict, or a succeeding prosecutor may still file a charge on the same facts. No one, it seems, would have the temerity to suggest that the act of the prosecutor constituted an *adjudication* of acquittal. That case has never reached the court; and it certainly makes no difference what reason the prosecutor has given, i.e., whether "insufficient evidence" or something else. And in such a situation the court certainly has no power or jurisdiction to call in the proposed defendant and demand that he plead or stand trial. To my mind the situation in the present case is substantially the same. The regional directors are, in effect, assistant prosecutors; the prosecutor (General Counsel) has notified all interested parties to consult them first, and if not satisfied, to "appeal" to him; this may be done very informally, indeed by letter. When the General Counsel acts, no findings whatever are given to the parties,—no results of an investigation. Indeed, with the immense volume of such appeals, it would seem impossible that he, personally, should even see all of them. There is simply a notice and ruling that no complaint will be filed, with or without a stated reason. There has been no pretense of a hearing on notice.

In my opinion there has been here a mere declination to file an unfair labor practice complaint, and nothing has been adjudicated. The views expressed herein appear to be in complete harmony with the opinion in the recent case of N.L.R.B. v. Swift & Company (E.D. Mo.), 130 F. Supp. 214, including that court's interpretation of the Garner case, discussed hereinafter. The majority opinion here seems to concede that if there had been no adjudication, the state court would have jurisdiction to proceed. The only suggestion in the majority opinion which lends any color to the supposed authority of the General

Counsel to adjudicate, is that § 153, supra, gives him authority "on behalf of the Board" to investigate charges, issue complaints and prosecute complaints. When read in their full context, these words do not alter the nature or substance of the powers and functions given to the General Counsel. They seem to mean merely that he is the prosecutor of the Board; and they are apparently only incidental, perhaps traditional, in nature. The General Counsel cannot act for himself personally, nor for the government generally. These words merely point out the department or body to which he and his functions are attached. His functions and duties are such that he is really an independent chief administrator of labor relations, rather than the attorney for the Board. In any event the authorities hold, beyond question, that he is wholly independent of the Board in performing the functions with which we are concerned here, and that he cannot be coerced in any way by the Board; also, that he is most certainly an administrative officer. Likewise, it might be said that any prosecuting attorney acts "on behalf of the court," for our courts are the body of the government finally entrusted with the enforcement of law; yet no one contends that a declination to act by a prosecuting attorney adjudicates a lack of guilt. Moreover, if the General Counsel is actually and inherently an agency of, or an inherent part of, the *Board*, it should be able to control his actions. In the respects concerned here, at least, it most certainly can not.

It is held, as indeed it must be, that the action taken here by the General Counsel is final. (Title 29, § 153 (d) U.S.C.A.; Hourihan [806] v. N.L.R.B., 201 F. 2d 187; Lincourt v. N.L.R.B., 170 F. 2d 306.) It is not even suggested, by court or counsel, that plaintiff here did not invoke all the applicable provisions of the Act in the charges of unfair labor practices which it filed with the Regional Director of the Labor Board. (Contra to the situation in Weber, 348 U.S. 468). Thus, on the admitted facts and law, plaintiff has gone as far as it may possibly go under federal procedure without yet having obtained any adjudication by a judicial (or even quasi-judicial) body. It seems unnecessary to discuss the situation in those cases where federal jurisdiction has been declined because of the insufficiency of the dollar volume of interstate commerce involved; the situation there may be similar, but it is certainly distinguishable, for those declinations are made pursuant to regulations determined by the Board itself, not the General Counsel. However, the majority here seems to feel that, even there, state jurisdiction may be operative. Indeed, counsel presently representing these defendants are now in this court seeking to invoke state jurisdiction in just such a situation. (Gene Quinn, et al., Appellants, v. O. J. Buchanan, Respondent, No. 45,014, argued at this Session.)

In neither the Garner case nor the Weber case did the court have the present situation before it for adjudication. In the Garner case,

no application whatever had been made for relief under the federal Act, and the decision is predicated upon that fact. The court said: "Nor is there any suggestion * * that the federal Board would decline to exercise its powers once its jurisdiction was invoked." And in that opinion the court consistently referred to action of the *Board,* as a "tribunal" for adjudication. (See N.L.R.B. v. Swift & Company, 130 F. Supp. 214.) The present question could not have been directly decided there. In the Weber case only a partial application for relief had been made under the Act, giving rise to the now renowned statement of Mr. Justice Frankfurter that: "If a ruling on (D) necessarily encompassed a ruling on the other subsections, we would have a different case." Here, full application for relief was made, although plaintiff could not and did not even *reach* the Board, as indeed the employer did to a limited extent in the Weber case. The Weber case seems to have proceeded on a theory of exhaustion of remedies; the federal remedies have been exhausted here. Also, in the Weber case the court held that if the labor board itself had held that there was no unfair labor practice (on the merits), the state court might have jurisdiction. We need not go that far here to sustain our jurisdiction. Both in the Weber case and in the subsequent case of Amalgamated Clothing Workers v. Richman Bros., 348 U.S. 511, Mr. Justice Frankfurter (and the court) seems to invite the presentation of cases exploring the "penumbral area" which can only be made clear "by the course of litigation." In so far as I can see, this case is, at the least, one for such an exploration. Certainly the Supreme Court of the United States has not adjudicated the present question.

So far as concerns the reference to the so-called "protected area" in the Weber case, it may be said that it is at least doubtful if those statements were necessary to the decision there, or that they are applicable here. If such an "area" exists it would certainly exist as a matter of substantive law, which any court must enforce, and thus would not be a mere matter of jurisdiction or procedure. If there is a restriction of rights guaranteed by the federal statute, then the plaintiff should be denied relief on the merits—not on the ground that the state court lacks jurisdiction. And if it be suggested that the General Counsel here may have ruled as a finality that the picketing here was within the "protected area," (which, by his own words, he did not) then we would be conceding to him legislative as well as judicial powers, when in fact he has neither; [807] for if he is permitted to write words into the act which are not there, he is legislating.

The courts are expressly given a power of review over actions of the *Board.* (Title 29, § 160 (f) U.S.C.A.). No right of review is available here under the provisions of the Act, for the simple reason that plaintiff could never *reach* the Board with its charges. All power of review in this situation has been denied (Lincourt v. N.L.R.B. (C.A. 1), 170 F. 2d 306). The provisions of the Administrative

Procedure Act expressly except from judicial review those matters "committed to agency discretion." (Title 5, § 1009, U.S.C.A.) Indeed, no one in the present case even suggests that plaintiff might have procured any review of the action of the General Counsel, anywhere. In other words, there is here a final order of an administrative officer, directly affecting substantial property rights, with no right of review whatever. If this is the meaning and intent of the appropriate part of the Act, I, for one, have a serious doubt of its constitutionality as so construed, for it would certainly seem to impinge upon the Due Process clause of the Fifth Amendment. In N.L.R.B. v. Swift & Company (E.D. Mo.), 130 F. Supp. 214, speaking on substantially identical facts, the court said, l.c. 219: "Therefore, in the present case the respondent Swift is faced with a situation where it alleges a grievance which, under the Garner case, is broadly subject to the jurisdiction of the Federal Board, whose General Counsel refuses to issue a Complaint on which an adjudication could be made, and then turns around and contends that the State procedure is precluded. In effect, the General Counsel of the Board is contending not that there is a conflict of remedies, but that there should be no remedy whatsoever. Having in mind the language of the Garner case that the manner in which the matter is decided does not destroy the potentialities of conflict where a conflict exists, it is clear in this case that no conflict can arise when the road to an adjudication by the Labor Board is thus blocked To hold otherwise would deny the respondent due process of law." I see no reason why the right of free speech, guaranteed by the First Amendment (and which, along with the Fourteenth, defendants have specifically urged) should emasculate the Fifth Amendment. Looking at this matter realistically, there is no doubt that uninhibited "peaceful" picketing, particularly at the vehicular entrance of a plant, as here, may utterly destroy a business which has no existing labor dispute whatever. It has never been my conception of due process that such acts may be fully and finally sanctioned without any right of appeal by the owner of the business to a court or judicial body; such, to me, seems to be contrary to the principles of a government of law. If this be true, Congress could only correct the situation by providing a recourse to some judicial body, and not merely by defining the "penumbral area."

While these cases usually speak of "jurisdiction" or a "lack of jurisdiction," I doubt that this is truly a question of jurisdiction. The question is rather whether the state court has been prohibited from proceeding in a field where the federal jurisdiction may be paramount. The state court certainly had jurisdiction of the parties and a general jurisdiction to determine what might constitute a violation of state law. Under these circumstances, when the parties stipulated to the filing of the charges of unfair labor practices and to the result of that action, I think that the trial court was at liberty to

776

proceed on the merits to adjudicate whether there had been any violation of Missouri law. It merely dismissed the petition, on oral motion, giving no reasons.

Under these circumstances, I think that the judgment should be reversed and the cause remanded for proceedings in accordance with the views herein expressed, and specifically to determine, on the merits, whether the acts complained of constitute a violation of Missouri law. *Hyde, J.,* concurs.